Good morning, Your Honors. May it please the Court. I'm Stephen Allison, and I represent Appellant Houston Casualty Company, or HCC as I'll refer to them. And I'd like to reserve five minutes for rebuttal, please. Keep your eye on the clock. We'll try to help you. I will, Your Honor. Thank you. The District Court's judgment below violates bedrock principles of California insurance law instituted by the California Supreme Court in Brant and Blue Ridge starting nearly 40 years ago. The District Court's ruling ignores the well-established right of an insurer to pay claims, reserve rights, and then bring a declaratory relief and recoupment action on disputed coverage issues. In so doing, the District Court essentially created a new tort of bad faith initiation of litigation. Such an expansion of bad faith is unsupported in California law and would, excuse me, create uncertainty and delay to the clear detriment of injured third parties. It is for this most fundamental reason that the District Court's judgment should be reversed. Now, it's important to start with the undisputed fact that HCC paid the full $2 million of benefits due under the insurance policy issued to appellee, excuse me, Sebus, to settle third-party claims while reserving its rights to dispute coverage under a variety of coverage defenses. But there was no denial of benefits. After all the payments were made to the third-party claimants and the policy exhausted, HCC brought an action for declaratory relief and recoupment of those settlement payments under established California law. Now, the District Court, to be sure, ultimately decided against HCC on those coverage issues. But it then went a giant step further in the phase two of its proceedings. It found HCC in bad faith for maintaining its coverage positions by instituting this litigation. Now, the damages awarded by the District Court were Sebus' attorney's fees occurred in defending against the coverage litigation, not damages from delaying or withholding benefits, those had been stipulated out of the case, and not some other category of damages caused by the alleged bad faith. It was solely for HCC exercising its statutory rights under California law to file a declaratory relief action. Now, if allowed to stand, this ruling would place insurers in an untenable position. Either, on the one hand, pay claims that they in good faith believe are uncovered with no opportunity for recovery without the risk of this now viable bad faith counterclaim for unreasonable, and that's the standard under bad faith, initiation of litigation. That's your one choice. Or, the other choice you could have as an insurer is to outright deny payment of the claims, leaving the third parties uncompensated while, for some indeterminate amount of time, while a declaratory judgment action is filed and decided along with another inevitable bad faith counterclaim. Okay, I appreciate that learned presentation, which I think sets out in an overall sense what the issue is. I'd like you to focus more on what the record shows. The undisputed part of the record shows is related to the farmers' claims that arise from physical damage. Was it all of their claims, or only part of their claims? I think that that was the entirety of the underlying basis of their claims. Their claims were measured by crop yield loss. That's how you would measure the damages. And I take that point. Let's just say, arguendo, that I, at least I, would agree with you that this has to do with physical damage and that the damage of the crops here is what we're talking about. What I want to know is, is the undisputed allegation that the entire claim covered damage to crops, or just a portion of it? Well, the farmers' claims were never turned into a complaint here. So there was never underlying complaints that we could manage. They were making claims, often very informally. There were claim forms, they were all sort of identical, that were submitted that didn't have that level of detail that we would expect. But if that's right, again, arguendo, let's just say we agree with you that the District Court got this wrong in terms of what happened here. That you need to show, you would show that this is physical damage, therefore it's not covered. They would claim it was. Don't you need to have a trial on that? I mean, there's an unjust enrichment claim that never got processed down there. But if you're right, don't we need to send it back for the court to try that issue? In other words, what actual portion of the million nine, roughly, is, if you will, legitimately attributable to damage to crops? Yes, and I would say that does not need to, Your Honor, and here's why. The issue is, it's an interpretation of the policy, which is an issue for the court, it's de novo. There was not a dispute as to the facts. There was, the court did not find summary judgment should be denied because of a genuine dispute of fact. The court accepted the facts. Parties brought cross motions on that point. And I get that. Now we can't go back on the summary judgment. I'm trying to focus in on what's undisputed. What I'm not sure, based on looking at the record, whether 100 percent of the 1.9 million that was paid was attributable to physical damage to crops. If it was, then that, we don't need to send that part back. But if it was never litigated, we don't know what portion was attributable to physical damage, right? I would suggest that it was, and I think the most clear evidence of that is the report in the record of Jerry Cass, who was the expert that went out and interviewed the farmers. And where is that in the record, please? I'll get that for you in just one second, Your Honor, if I could grab my glasses. Mr. Cass' report is at five excerpts of record, page 685, is where it starts. It's several pages. And in that, he says, 685, thank you, Your Honor. And would we consider him an agreed expert of the parties? He was not a litigation retained expert. He was retained during the claims handling portion of it. Mr. Cass was suggested to HCC by SEVIS. That was an expert they put forward, and the parties agreed to use Mr. Cass to help essentially adjust and evaluate the claims. Mr. Cass says at that page in his report that all the growers he visited tell the same story. And he says there that the crops emerged and were growing vigorously until the herbicide was applied, and then he says, and I'm quoting, then the canola plants became discolored, twisted, and stopped growing for three to four weeks. And I did see that, and so if that's right and it's not rebutted, then you would argue it's 100%. But I don't think it really says that. It just says that's what he saw. But there was no finding by the court, right, that that's what it was? Well, the court didn't, the court found that the evidence was undisputed and found that it was irrelevant that that's what it was. Yeah, no, I get that part. That's the legal part. But in terms of the factual part, there's no finding by the district court that the application of the herbicide, pesticide, whatever it is, diminished, ruined the crops, right? I think the court accepted that fact as the, because the parties didn't dispute it. Okay, but does that mean for purposes of our panel that we should assume that the record shows that if your opponent's wrong on the law and the district court was wrong on the law, that 100% of what you paid was attributable to the property damage and therefore you get it all back without anything further? Yes, Your Honor, that is our position. Can I ask you one more factual question? I'm sorry, Judge. After the three to four weeks, what happened? You just read from his report that things went south for three to four weeks. Then what happened? Right, and so then they, I think in some instances, those crops did not catch up, so to speak, and then they hit a hard freeze that year in September, which was a little early, is my understanding. Most of these were growers in the western provinces of Canada. And so therefore, that locked in that damage. And then the measurement of those damages was in the reduced yield. So I think that they never caught up was the word that I believe the agronomist used. The crops never caught up. That to me, forgive me, I don't want to take any time, that to me suggests that there are some factual disputes that need to be resolved. If we agree, arguendo, that you're right on the law and the district court got it wrong, the amount that you get back would have to be determined in a new trial or some type of tribunal, would it not? Because you've got freeze, you've got this one expert. We don't know much about that. Isn't that a fair statement? I think that if, and if we're just focusing on the coverage issue, not the bad faith issue. That's right. For the moment, just the coverage. If you're just focusing on the coverage issue, I suppose there is, I understand the court's concern that the record may not be have as fully developed as the court suggests. But I would return to the fact that when the parties had the opportunity to dispute that, neither did. And instead submitted it to the court and said, you can decide this, your honor. And he didn't, because he never got to that point. He just went on the law from his perspective, right? Yeah, from Judge Bouchant, yes, she did. That is exactly. I apologize. Okay. And she, yes, she determined two things. One, she did an interpretation of the policy, and I think we lay out in our brief why we think that was incorrect under the canons of interpretation. And then two, reached a conclusion after that interpretation that it wasn't property damage because focused on the measurement of the damages as a legal matter as opposed to the actual tangible harm to the crops. Judge Bouchant. Yeah, so I, I thought about, I've been thinking about this issue and trying to figure out what would not count as property damage, you know, which is defined as physical injury, including the loss resulting from the physical injury. So I, and also has, if I recall correctly, the word rising from or resulting from. And so it seems like, you know, am I correct in thinking that interpreting that language, that doesn't require a jury or something, that doesn't require, that is like legal interpretation, it's a statutory interpretation, except in this case, contractual interpretation. So that would not be driven by, so the reach of that language would be something that either we need to decide or the district court needs to decide. Is that correct? Correct, your honor. Correct, your honor. Correct. That is a matter of law. And then, and then I think it's, the law is pretty clear that arising from or resulting from is language that gets interpreted pretty broadly, like it extends. We've seen, we've said that in other. And so I was trying to think of what, what does not, I mean, if there's an early freeze and the plants aren't, and the reason you have, have reduced yield is because the plants are, are not far enough along. That would seem to, that loss would seem to have result from the fact that the plants got set back by this. And so that would seem to be covered. It got physically set back. So I was trying to think of what would not be covered. And the thing I thought, the only thing I could think of, and I'm curious as to what your position, and obviously you're opposing counsel, what would not be covered. The thing I could think of was if there was a middleman, you know, that sold these canola seeds, right? And, and they sold, and their reputation was ruined by this or something like that. And so now nobody buys from them anymore. So they don't, they didn't experience any physical harm from anything, but their reputation is ruined. And so they've, they've got a reputational harm and so they could sue. That would not be physical. But I, I, that's the only type of thing I could think of would not, maybe I'm not being creative enough, but like, and I don't, I don't, I didn't see anything like that in this record. I didn't see the farmer saying our reputation is ruined or something like that. There was not. Let me give you, and I think your Honor's example could be one. Let me give you one that maybe even is a little closer to our facts, but would be on the other side, which is, and there's a couple of cases that were cited here. If a seedsman puts in the wrong kind of seed. So I need canola seed and I accidentally put in, I think in one case it was goat grass. It was a weed, a noxious weed. And the weed comes up and it doesn't harm the plants. In other words, the weed just sits there, right? There's a, there is one case that says that's not property damage because it didn't harm the other plants. It, it just wasn't the seed it was supposed to be. Or make it even more simple. I ordered canola seed and you sent me corn. And I plant my property, and wait, wait a minute, I bought canola. I didn't buy corn. That would not be harm to the plants. The plant, the corn plants grow up. They're perfectly fine. But they, that would be something that would not be a problem. You don't have much time, but this is kind of really important because, you know, my colleague Judge Smith makes, raises an important point about, and I was thinking about, is there a factual dispute here that needs to go back? And, and I'm trying to think of the, just to be clear, the interpretation of what constitutes physical damage or property damage and, and the reach of that, especially combined with the rising from, that's not really a factual issue that would need to, it's, we, we could determine that just as well. In fact, sort of cut off the middleman, but cut off the district court. It, it would only be if we thought that there was some sort of damage that does not fit within that might plausibly be included here. That's why I'm, I'm struggling with what that would be. I, I guess I, I need to ask your, your colleague on the other side about that, so. Yes, Your Honor, I'm happy to address it, but I do only have a few seconds left. We'll give you a little extra time because we've taken you a little bit over, but why don't you save the rest of your time for rebuttal. I will, Your Honor. And we'll get you back here. Thank you, sir. All right. So, Mr. Brown. Good morning, Your Honors. May it please the Court. I'm Doug Brown. It's my privilege and pleasure to represent CBIS in this matter. Well, can I? Yes. I know you have a pair of, but you can see where, where at least, for me and I think many of my colleagues are curious. As I understood the district court's reasoning here, the district court basically said this is not property damage covered by the property damage clause of this contract. There's a couple reasons. The district court said because that would upset the expectation of the parties. Let's put that aside for a second, but just like interpreting the language. Basically said, well, they're not, you know, they're not asking for, the farmers were not asking for, you know, for recompense from the damage. They were asking for recompense from the yield loss. That I struggled with because that's a little bit like if you run your car into my car and I say, you know, and a judge was to say, we're not asking for damage for, for recompense to having, you know, his car's got dents and all busted up, but he's asking for the fact that he, you know, recompense because he, he can't use his car now. You know, he can't, can't use his car for his work. But it seems to me that would certainly be a loss that quote unquote resulted from or arise from you running into my car and the physical damage that that created. So I'm, that seemed to be what I understood the district court judges sort of textual analysis to the extent there was any. Are you, do you think that's correct? And why is that not, it seems problematic to me because you, you can always, rarely, rarely do people come in and say, I want a new car. They come and say, I want money. Right? So the fact that just because they're asking for economic damages doesn't change where the damages arose from. Right. Multiple responses to that. Thank you for the question. Regarding the car analogy, I think one thing that's important to recognize here is that the property that HCC is saying was damaged was the plants. SEVA sold the seed. The plants essentially are the seed. They grew out of the seed. So property damage exclusions, property damage and insurance policies in general, that refers to damage that happens to other property. If SEVAs had sold a bag of seeds that maybe had some small rocks in it and the growers ran their tractor over the field and the rocks damaged their tractor, that tractor suffered property damage. In the case of the goat grass, the noxious weed, they sold a bag of seed that had what it was supposed to have but it was mixed with some noxious weed. That noxious weed grew up in the field and hypothetically, if it had required remediation, if it had required multiple years. So just to be clear, your position is that, you know, to go back to my car analogy, that if you sell a vehicle with bulletproof glass and somebody shoots your bulletproof glass and it turns out it's not bulletproof and it wrecks your nice pretty bulletproof car. That was a judge that had the car. That would not be property damage, you're saying. It would only be somebody else's property. Where does it say that? Well, you actually anticipated exactly the hypothetical. I was going to say dents in the car, not bulletproof glass, but you went exactly where I was going to go. And no, that's a product defect. That would be a product defect claim. It would not be property damage. It would be your product didn't work the way it was supposed to work. And this is a unique product though because it grows into something, right? It grows into other properties. And I appreciate that, Your Honor, because it is a unique product. Seeds are unique. And that's why this kind of coverage, errors and omissions for Seidman's, exist. And it's somewhat unique. And that's the problem with- But you say this kind of coverage. This kind of coverage is not a Seidman's policy. I mean, they had a Seidman's policy. And instead they got what's a more normal sort of errors and omissions policy. And that's part of the problem here. If there was a Seidman's policy, it wouldn't have been, it wouldn't have had this kind of disclaimer. But your client opted for a different kind of policy. Well, what we got, Your Honor, was we got a policy that, in its grain of coverage, and I'm looking at the record, this is 5 ER 660. In the insuring agreement, the company shall pay loss and claim expenses in excess of the deductible, subject always to the policy's limits of liability. And here's the important part, that an insured shall become legally obligated to pay as a result of a claim made against an insured for a wrongful act arising from professional services. And in an endorsement to the policy, it defines professional services as services as a Seidman performed for others for a fee. So this, that's what they were insuring. If we look at the facts of what Judge Oda found in her findings, in fact, from the first trial, and I'm reading from 1 ER 62 lines 3 through 8. In this case, the farmers made claims against CBIS for the poor performance of its seeds in 2018 and sought, quote, compensation regarding the non-performance of the CBIS canola in the growing season of 2018. Ms. Crabtree, HCC's claims handler, testified that she received complaints from the farmers about the seed's low crop yield and ineffective growing advice from CBIS. Essentially, the farmers complained that CBIS sold them poor performing C5507 and C5522 seeds in 2018 and for the 2018 growing season, not for CBIS's poor design of those seeds. Can I ask you a question? I didn't discern this from the record, or maybe it isn't there, but partially because the trial court looked at the reasonable expectations of the parties. What was the motivation behind going from a more direct Seidman's policy to this policy, and what was the premium difference, if you know? The premium difference, I don't know. I apologize for that, Your Honor. I wasn't working for CBIS at the time. The motivation was they were simply shopping their coverage, and they went to their broker who went to a wholesale broker and said, we're looking for new Seidman's E&O. Do you know anyone who can place it? And the wholesale broker reached out to HCC. HCC said, yeah, we can do that, and they wrote this coverage. And the way that they wrote this coverage was with that endorsement. And so that's why we took the somewhat bold position in our brief that this was now a factual issue, because based on Judge Oda's findings, this is exactly the kind of claim that this coverage was intended to cover. Now, before I jump into my next step of the legal analysis, I do want to very quickly address some questions that Your Honor asked of my colleague, Mr. Allison. To your question, Judge Smith, Jerry Cass did not visit all the growers. The only thing that we have the same from all the growers is that signed claim form. He tried to visit. Some of them he had phone conversations. Some of them he couldn't reach. He did get damage amounts, so he got the crop yield loss numbers. That was his primary role, frankly. But he did not visit all the growers. Let me ask a follow-up to that, which is, as I understood these claims, while the forms were characterized as the downstream crop loss yield, et cetera, I mean, what is your position on, does that, if you, I know you're having trouble doing it, because I don't think you agree with this position, but if you, if a court was to conclude that the loss yield was a result of property damage, the kind of property damage covered by the, what other loss is there in the record other than something that would tie back to the property loss? And again, I'm not asking you to concede that that was actually a property loss within the meaning of the, but if that was the position, I'm trying, it kind of goes to Judge Smith's question to your opposing counsel earlier, what other kinds of losses are there in this record? Sure. Well, one thing there is not, is any grower complaining that they lost the use of their field or had to remediate their field. That's not here. But going to your question, What about reputational? There's no, there's no allegation of that. It was diminished yield and diminished quality. So the seeds sold for less money because they were lower quality and there were fewer of them. And different growers had different mixes of those. Fewer of them when they would, when they would harvest, they would get, they'd get fewer seeds and then they were like smaller or like didn't work as well or something like that. Correct, Your Honor. Some growers got fewer bushels. Some growers got seeds that were of inferior quality. So they sold for a lower price. I'm just curious. Does that mean like that you don't get as much canola oil out of it, out of a seed or something like that? Is that, is that what lower quality means? I'm just kind of. Yes, and they press this into different grades. And what they can sell the seed for depends on what grade it can be pressed into. Can I just shift to the sublimit aspect? The, just looking at the actual language of the property damage sublimit refers to claims that are in quotes based upon or arising out of property damage. In your brief though, you argue that the sublimit is in quotes only relevant to whatever portion of the liability was solely attributable to property damage. How does your claim in the brief square with the language of the policy? Thank you, Your Honor. That's where I was hoping to go.  So again, I already read for you the granting provision, the trigger of the policy. There's no dispute that that was triggered. HCC has never disputed that coverage was triggered here. Now let's do a quick tour through the policy and let's start with the exclusion that used to exist. This is on 5 ER 673. The exclusion says, the policy does not apply to any claim, claim expenses, notification expenses or loss, subsection I, 4, 1, bodily injury or 2, property damage. It then goes on to say, however, this exclusion shall not apply to a claim based upon or arising out of the performance or failure to perform professional services, which is what we have here, as long as the bodily injury or property damage was not directly caused by an insured. There has never been any allegation or fact to support the idea that CBIS directly caused this injury. CBIS didn't go out there and spray any of these chemicals. CBIS didn't step on any plants. They didn't harm any plants. Okay? So if this endorsement weren't there, this exclusion would plainly not apply. Plainly. CBIS, no allegation that CBIS directly injured anything. Now they take this endorsement, which by the way, there's something in HCC's brief that I agree with. They admit in their opening brief that this endorsement is not an exclusion. They write, quote, the sublimate is not an exclusion. Indeed, the provision deletes an exclusion from the policy form. Instead, it affirmatively grants coverage for claims arising from property damage. Okay? So they're trying to use it as an exclusion, but they say it's not an exclusion. And then they turn around and they say, well, yeah, and it's an exclusion and it's clear and conspicuous as exclusions must be under California law. Well, how is it clear and conspicuous if even HCC itself is saying this is not an exclusion? It doesn't make any sense, Your Honor. And to your earlier question, Judge Van Dyke, it would allow this endorsement, which was intended to add $100,000 of property damage coverage that would not otherwise be there, it would allow this endorsement to eviscerate this coverage. Because as Your Honor anticipated, almost every seedsman's claim is going to involve a plant that looks a little funny or a plant that doesn't grow the way it was expected to. It's the nature of the business. And that reminds me to your question. You keep saying a seedsman's claim, but that is the whole problem here, right? Like a normal seedsman's policy like you had the year before, it isn't written this way. I mean, that's one of the challenges of this case. Your story is that you are attempting to sort of create this like jerry-rigged seedsman's policy from an EEO policy. That's your story. Their story is we're giving you an EEO policy and I think they're saying that the property damage, $100,000 is not an exclusion, but it clearly, the language is attempting to exclude something, like it's, right? It's attempting to exclude something from the EEO policy, property damage, and then they add back in and give you a lower limit on that is their interpretation. And so I struggle whenever you say it's a seedsman's claim because it's just not a traditional seedsman's policy. Well let's call it a professional negligence claim or let's call it an E&O claim. It's the same thing. The bottom line is SEVIS was negligent. It negligently selected and sold seeds that didn't perform. But it is very normal to have EEO type policies where typically what you're doing is you're trying to insure for professional negligence. And they won't cover property damage. It's not abnormal to have those not covered. Like if I was as a lawyer or you as a lawyer had a professional negligence policy, it might very much limit your property damage exposure because that's not the main thing they're actually insuring for. They're insuring for your professional negligence, right? Like you're causing somebody to go bankrupt or something like that. And if you hit somebody with your car, they want to make sure they're not subject to $2 million. They're only subject to $100,000. Okay. So what your Honor's question goes to I think is essentially what's the wrongful act, you know, in order to trigger coverage here. And I first want to emphasize that there's not been a dispute. We didn't brief. There wasn't argument at the lower level, you know, on what the wrongful act was. But the wrongful act was SEVIS selecting and selling these seeds. SEVIS has multiple varieties of seeds. These are the ones it chose to sell and it turned out that under the environmental conditions that year, these seeds didn't perform the way they were supposed to. That's a negligent provision of their professional services as a seedsman. Can I ask you this? I just want to shift because you don't have much time left to the second part of this issue, and that's the attorney fees and the bad faith claim. If, if, arguendo, we were to conclude that the property damage sublimit does apply to some degree, any degree, would you agree that in that circumstance that ACC could not have acted, in quotes, unreasonably and therefore in bad faith? No, Your Honor, and the reason for that is because they had five other defenses that they didn't even bring up on this appeal that were unreasonable that would have, if they were right, or if those defenses were reasonable, eviscerated even, even that $100,000. So I understand your answer to that because I thought about it. But what you're basically saying is that your interpretation of, of that, that you, that you can have liability for this kind of claim when you, that the insurer can only bring all claims that are, they can't take a kitchen sink approach. They can't do what almost every lawyer does. We see it all the time. They, they have, you know, we're like, oh, the first two claims are actually sort of, the first two issues are sort of interesting and, and are close. The rest of them are, are the kitchen sink, right? And you're saying that they would be liable under what I think is already an extension of, I forget the name of the case, the, the, the rule, but the, the, I'll get it, the, the Brandt fees. If you, if you extended the Brandt fees to this concept, not only are you saying it should be extended, but like if you have two, two meritorious claims or two, I mean, yeah, I think under your argument, even if you had two meritorious claims, so they won on two things, but they lost on their other five or the other four or other one, that you could still get Brandt fees. I, that seems, that seems a real extension. Okay. So I want to, I want to answer your question. I've got a red light flashing at me here. There's a trap door also. Don't worry about that though. So I first of all want to be clear. They have tried to frame this as the act of bad faith was bringing the lawsuit. It wasn't. Insurers are allowed to file lawsuits to resolve coverage disputes. Blue Ridge established as a procedure for doing that when they, you know, had an opportunity to settle the case to avoid being trapped under the Johansson of being squeezed between bad faith refusal to settle and paying coverage that wasn't owed. But they were allowed to sue. What they weren't allowed to sue, to do was sue based on unreasonable positions and they were not allowed to conduct bad faith in the course of their claims handling. And Judge Oda in the phase two trial found at least six different ways, all of them before HCC paid a dime, that HCC committed bad faith. You know, number one, HCC failed to fairly and properly investigate. They're not allowed to do that, no matter whether they pay or whether they later sue. Because that failure to properly investigate caused CBIS to have to retain counsel and fight for the coverage that it was owed. Number two, HCC unreasonably... So I'm very familiar, I think, I'm sure my colleagues are very familiar with that. It's a challenge because if they had not brought suit, if they'd done all those things that the district court judge here pointed to and said, it's not the bringing of the suit, it's the bad faith. But if they'd done all that and never brought a suit, we wouldn't be here. We wouldn't be here, right? So it's hard for me to not see how those things are really just another way of saying they brought a suit that was not investigated well, that was in bad faith. No, so the key distinction here is we wouldn't be here, but the reason we wouldn't be here is because the damages would not have arisen. The tort would have still been committed and I suppose if CBIS wanted to be pedantic, it could have sued for bad faith and they probably would have said, oh, you don't have damages. But the tort was the bad faith in the claims handling, in the basically bullying CBIS. I mean, this was a case that was exactly the kind of thing for which CBIS brought coverage and they come out of the gate with six different reasons why it's not covered and they persist in those throughout. And then they say, take half of the coverage, take a million bucks and be done, or take two million and we can sue to get it back. And then they sued to get it back. From the get-go, they were using all these defenses to try to pressure CBIS into taking a lot less money than it should have been owed. Sounds like an insurance company to me. But it's not what insurance, it does, and I get the joke as somebody who represents a lot of policy holders, but that's not what the law says insurance companies can do. This isn't, tough dealing is not what insurance companies can do. If it turned out they were right about this property limit, then you got a great offer, which was to get a million dollars instead of $100,000, and you could have gotten a boon on that. And if you're right, then they should have paid the $2 million and walked away. But what we've added to this, the district court ruling, is that now if they're wrong, it seems like figuring out the distance between being wrong versus being unreasonable is a very thin line, it seems like, under your position. And I would direct the court, I would direct your honors to Judge Otis' findings, because she goes through in detail for pages the testimony, the documents, the things that HCC ignored that it shouldn't have, the faulty analysis. Yeah, I read those findings, is that basically insurance companies need to do a, put a lot more stuff, write a lot more stuff down whenever they're investigating a claim. I mean, it insurance companies either, but I get, it's just like, it seems like it would be adding even more and more red tape, administrative hassle, if you were ever going to bring one of these claims, in which case insurance companies just would not be able to bring them, it seems like, because of the risk would be too high of this kind of... Well, no, I mean, insurance companies do write a lot of things down. They maintain a claims file, that's the first thing you get in discovery in every insurance case, and it's for exactly this reason. They document all of it. The emails are in there, the notes of the adjuster are in there. If they got outside opinions, as they did in this case, those would be in there, but then they'd be privileged until they invoke the advice of counsel, et cetera. We could talk about this for a long time. Let me ask my colleague if there are other hesitations. I just have one question. Can you cite us to any California case that has authorized recovery of attorney fees in this circumstance? In a similar circumstance, I'll point your honors to the case of Mustachio. It's Mustachio versus, I want to say, Ohio. I don't want to misspeak on this. The citation is 44 Cal App 3rd 358. Mustachio predates Brandt, but what's important, and that's why we didn't cite it in our brief, but what's important about Mustachio is that Brandt favorably cites and, in fact, approves of Mustachio, and so I'm going to read from Brandt here. Can I stop you real quick? That's before this whole practice of recoupment came into being, correct? Well, Brandt essentially resolved a split of authority between Mustachio and another case that was called Ostero. So Mustachio, in some part, it wasn't the facts that led to the Brandt decision, but it was the legal decision that led to it. I know you would read it well, but why don't you let us read Mustachio and any other questions from my colleague? I know you'd like to say more, but unfortunately, this is a court of appeals, and we can't go on forever. I've got six minutes and four bonus seconds as it was, so I appreciate that, Your Honor. Okay, thank you very much. Thank you. Counsel, you have some rebuttal time. Since you were underwater, we're going to give you two more minutes to respond. Thank you, Your Honor. I'll try not to stand on the trapdoor when I do that. No, please. So I'm going to go, I'm going to try to make two primary points. First on the property damage limit. The important point here, and this goes to Judge Van Dyke's question, which is that property damage is, in this context, in this E&O policy, the reason it's structured the way it is, is property damage is very typically covered under a CGL policy. In this policy, and it was, this is in the record and it's in the policy, has a requirement that the insured have a CGL policy for exactly this reason. Because property damage is typically covered under CGL, not a Seitzman's E&O. And here there was some additional coverage given through the endorsement. I want to go to the last point that my opposing counsel talked about. And this is really important and fundamental. Brandt and Blue Ridge addressed this point. That's, excuse me, Blue Ridge and Buss addressed this point and then supplemented by Brandt. And these cases all work together. And where do they, when you put them all together, where do you end up with? You end up with the California Supreme Court saying, insurers, if you have a doubt, pay. Pay defense costs or pay settlement costs. And then bring your declaratory relief action on disputed coverage positions and determine if you were right or wrong. And you supplement that. And that's why Brandt says to obtain benefits. Because think about it this way. The only time there could be a situation to retain benefits is if you're bringing a Buss action or a Blue Ridge action. That's the only time you would have it. And those two procedures were expressly laid out and encouraged by the California Supreme Court. And then the last point I'll make is you have to come on top of all of that with California's litigation privilege in Civil Code Section 47, which is absolute and has one exception. One, Melissa's prosecution. If the district court here could not have really been any more clear if you look at, frankly, paragraph, page two of the findings. And it says that SEVA's claimed that we maintained the coverage positions and brought the declaratory relief action. Can I ask you for, Judge Smith pulls the trapdoor on you. So that case that was just mentioned at the end, are you familiar with that? Do you have any response to that? It was not cited in any of the briefings. So I would. I would. I would. Mustachio. Mustachio. I would. All I would point out is I think it's very important that it was before not only Brant, but before Buss and Blue Ridge. You read these cases together. And so I'd be happy to address Mustachio if it's important in a letter to the court. But I had not read it in preparation for this because it was not cited. Other questions? One of my colleagues. Thanks to both counsel for your learned argument. We appreciate it. This is an interesting and challenging California insurance law case. So thank you. The case just argued is submitted. Thank you, Your Honors.
judges: SMITH, VANDYKE, Stinson